IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHELLE L. TUSSING,

       Plaintiff,

                             Civil Action 2:14-cv-588
v.                           JUDGE ALGENON L. MARBLEY
                             Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## OPINION AND ORDER

Plaintiff, Michelle L. Tussing, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply (ECF No. 18), and the administrative record (ECF No. 7). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.   BACKGROUND

Plaintiff filed her applications for benefits in December 2010, alleging that she has been disabled since December 31, 2008, due to back pain/injury, arthritis in her back, leg pain, anxiety issues, a knee injury and swelling in her hands. (R. at 203-09, 210-16, 264.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Amelia G. Lombardo ("ALJ")

held a hearing on December 11, 2012, at which Plaintiff, represented by counsel, appeared and testified. (R. at 41–72.) Alfreda Bell, a vocational expert, also appeared and testified at the hearing. On February 1, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 13–29.) On April 25, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision making the Commissioner's decision final. (R. at 1–5.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives with her boyfriend and two children on six acres in a rural setting. (R. at 41-42.) Plaintiff testified that physically she could not work due to her back injury and arthritis which causes her "great pain." (R. at 47.) Plaintiff testified that her primary care physician believed she may have rheumatoid arthritis given Plaintiff's complaints of "pain in every joint in my body." (R. at 48.)

Plaintiff estimated that she can walk and stand for fifteen minutes. (R. at 48.) She testified she could sit "comfortably" for five minutes at a time, but she has to shift positions. (R. at 48-49.) Plaintiff rated her pain severity at "never dropp[ing] below a 3" on a 0-10 visual analog scale. (R. at 49.)

Plaintiff also testified that her hands were "becoming a big issue." (R. at 49.) She remarked that her hands hurt and that she could not grasp or hold anything. She could only lift "five pounds, maybe 10." (*Id.*)

According to Plaintiff, she does not cook; her daughters do the household cooking. If they are not home, she will eat something simple like a banana or will microwave something.

2

Plaintiff does the laundry, "as in start the washer," but her daughters take the laundry downstairs. Her girls also clean the house. (R. at 51.) Plaintiff testified that she normally does not clean or do dishes because she cannot stand at the kitchen sink long enough. Plaintiff indicated that had cleaned the dishes in the past but it took her three hours or more. (R. at 52-53.) She does not often attend her daughters' school activities. (R. at 53.)

She testified she likes to be outside on a nice day. (R. at 53.) She likes to walk around her property looking at the flowers, deer and rabbits. (R. at 54.) Plaintiff indicated that they have chickens on their property, but her boyfriend, who is on disability and has a hard time getting around, walks down to the coop more than she does. (R. at 50.) She takes three or four short naps a day. (R. at 69.)

At the time of the hearing, Plaintiff was seeing her psychiatrist every two to three months and her therapist every two weeks, sometimes every week. (R. at 54-55.) She started seeing them when she began having pseudo seizures that she believed were mental not physical. (R. at 56.) Her seizures last "[a]nywhere from five minutes to hours." (R. at 56-57.) Going to therapy has helped reduce her seizures. (R. at 57.) Plaintiff testified that she does not drive and stopped "a couple of years" prior to the hearing. She noted she does not feel safe when driving. She still has a driver's license. (*Id.*) On a typical day, she plays computer games online and watches television. (R. at 58.)

Plaintiff disclosed that her father had molested her as a child. When discussing her father and the molestation, Plaintiff testified that she has reoccurring nightmares every night. The medication that she takes to sleep does help a lot with not recalling every detail of the dream. She also testified to having flashbacks where she recalls things that happened with her father.

3

Plaintiff also noted that if she is in a group of people, she feels "enclosed." (R. at 65.) She noted "[t]his has gone on my entire life." (*Id.*) She testified that she "managed" to work up until 2008, when she was physically no longer able. Plaintiff indicated that, at that time, she would "drink all the time" to manage and cope with her feelings. She stopped drinking less than five years prior to the hearing. (*Id.*) Plaintiff testified that the issues which cause her stress include crowds, close quarters, a lot of loud noises, new situations and men. (R. at 68.)

### B.    Vocational Expert Testimony

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant work included a order filler/parts sorter/packager, classified as medium, unskilled work; forklift operator/material handler, classified as medium/heavy, semi-skilled work; a fast food worker, classified as light, unskilled work, but performed at the medium exertion level; and a customer service representative, classified as light, semi-skilled work. (R. at 73-76.)

The ALJ proposed a series of hypothetical questions regarding Plaintiff's age, education, work experience, and residual functional capacity to perform work at a medium exertional level with a limitation for low stress work, defined as no assembly line production quotas and not fast paced. (R. at 76-77.) The VE testified that Plaintiff could perform her past relevant work as a order filler, packager and fast food worker. (*Id.*)

The VE also testified that Plaintiff would be able to perform 30,000 medium, unskilled, jobs in the regional economy, such as a laundry worker, hand packager-crate liner, or industrial cleaner; and 37,000 light, unskilled, jobs in the regional economy, such as a mail clerk sorter, night cleaner, or photocopy machine operator. (R. at 77-79.)

4

The ALJ also questioned the VE about jobs that a hypothetical person with Plaintiff's vocational background could perform if she was limited to light work. (R. at 77-79.) The VE testified that the individual could perform the jobs of mail clerk sorter, night cleaner and photocopy machine operator. (R. at 78.) The VE testified that these jobs, which numbered 37,000 were available in regional economy. (*Id*.)

When examined by Plaintiff's counsel, the VE testified that an individual was off task for 25 to 50 percent of the day with restrictions or interferences including not being able to work in cooperation with or in proximity to others without being distracted, it would affect her ability to maintain employment and would result in discipline up to and including removal unless there was some type of accommodation made. (R. at 79-82.)

### III. MEDICAL RECORDS

**A.     Mental Impairments**

**1.     Consumer Advocacy Model (CAM)**

Plaintiff sought mental health treatment through CAM on January 28, 2011. (R. at 638-41.) Plaintiff reported that she is "mad at everything" and has been "crying over small stuff." She has a history of sexual abuse starting at an early age. She has spent years trying "not to deal with it" by using drugs and relationships. Plaintiff described her childhood as "hell." (R. at 638.) Plaintiff also reported that she has recently begun to have episodes which have been diagnosed as "pseudo seizures." Plaintiff believed that she was most likely to experience a seizure when she was feeling stressed. Plaintiff also acknowledged that she smoked cigarettes, but would like to quit. (*Id*.) Plaintiff reported that she is no longer interested in drugs or alcohol, but both played a large role in life as a teenager and in her twenties. She tended to use both as a

means of coping with earlier life experiences. (R. at 639.) The intake social worker found Plaintiff was cooperative, and friendly, her mood was euthymic, and she had no difficulty expressing her anger. Plaintiff's speech was clear, but it was noted that she has no upper or lower teeth. Plaintiff appeared to be of average or above average intelligence. Her thoughts were organized, she was articulate, alert and oriented. Plaintiff was diagnosed with Posttraumatic Stress Disorder ("PTSD"), Chronic; with delayed onset and she was assigned a Global Assessment of Functioning ("GAF") score of 60, indicating moderate symptomatology. Plaintiff was recommended for counseling and pharmacological management/psychiatric assessment. (R. at 641.)

Plaintiff underwent a updated diagnostic assessment in July 2012. (R. at 623-24.) At that time it was noted Plaintiff was under the care of Dr. Cowan and was being prescribed Zoloft, Trazadone, and Vistaril, which she believed were effective for her. Plaintiff had been seen for individual counseling and her diagnoses remained PTSD, chronic delayed onset. Plaintiff reported that she would like to continue with individual mental health counseling, two times per month, and was working towards less anxiety, and night terrors related to her traumatic physical, sexual and mental abuse, perpetrated by her father. (R. at 623.)

## 2. Allison Cowan, M.D.

In October 2011, Dr. Cowan completed a mental status questionnaire on behalf of the state agency. (R. at 516-18.) Dr. Cowan noted Plaintiff was first seen on January 28, 2011. Dr. Cowan reported that Plaintiff was well groomed in clothes that were baggy, her speech was fluent and soft, mood and affect were "not too good" and dysphoric. Plaintiff was initially very anxious and worried. Dr. Cowan noted that Plaintiff's anxiety/PTSD has impacted Plaintiff in

6

that she has non-epilectical seizures that severely limit her functioning. (R. at 516.) Dr. Cowan noted that a work setting may increase Plaintiff's anxiety and intrusive thoughts associated with her PTSD issues. (R. at 517.)

That same day, Dr. Cowan also completed a daily activities questionnaire in which she concluded that Plaintiff has been "a fantastic patient." She reported that Plaintiff "is motivated to make gains and has done well with treatment. She would continue to benefit greatly from continued treatment. She continues to struggle daily." (R. at 520.)

On June 18, 2012, Dr. Cowan prepared a narrative in which she reported that she had been treating Plaintiff since March 21, 2011 under the diagnoses of PTSD. Dr. Cowan noted that Plaintiff had "faithfully attended both her psychiatric appointments as well as her therapy appointments." Plaintiff has "worked diligently" and made significant strides and had been stabilized to a regimen of Zoloft, Trazodone, and Vistaril. Dr. Cowan reported however that Plaintiff still had "significant limitations in her functional and adaptive capabilities." Dr. Cowan concluded that "When put under stress, she is likely to have pseudoseizures and a reduced ability to cope with changes or demands made from employers or consumers. In my opinion, she is not likely to be able to do full-time employment 8 hours a day 5 days a week." (R. at 618.)

Dr. Cowan also prepared a MRFC.[1] (R. at 619-21.) Dr. Cowan opined that Plaintiff was extremely limited in her abilities to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes and in cooperation with or in proximity to others without being distracted by them. (*Id.*) Dr. Cowan opined that Plaintiff was markedly

---

[1]"MRFC" is an residual functional capacity which limits its consideration to mental capabilities.

impaired in her abilities to behave predictably, reliably and in an emotionally stable manner and tolerate customary work pressures. (*Id.*) Dr. Cowan opined that Plaintiff was moderately limited in her abilities to carry through instructions and complete tasks independently and perform at production levels expected by most employers. (*Id.*)

### 3.    Regina McKinney, Psy.D.

Dr. McKinney consultatively examined Plaintiff for disability purposes on April 20, 2011. (R. at 448-54.) Plaintiff relayed that she felt she was disabled because "I can't walk far. . . I can't stand long . . . I have to rest frequently . . . I'm having pseudo seizures due to PTSD." (R. at 449.) She described a traumatic childhood due to alleged physical, emotional, and sexual abuse. (R. at 449, 452.) She described herself as frequently anxious and constantly depressed. She has been receiving psychiatric and counseling services for the previous five to six months. Plaintiff has a few friends with whom she has occasional contact. (R. at 450.) She occasionally prepares her own meals. She independently shops for groceries. She enjoys gardening and using a computer. She home schools her son. She occasionally watches television or reads. She denied avoidance behaviors and stated that she leaves her home regularly to shop, to attend appointments for her son, or to attend to her own doctor appointments. (R. at 451.) On mental status examination, Dr. McKinney found Plaintiff was cooperative and rapport was adequately established. She was clean and neat in appearance. Her grooming and hygiene were adequate. She moved slowly and ambulated with a cane. She appeared to be in pain. She appeared to be depressed as she presented with a flat affect. She displayed good eye contact. She displayed no other mood disturbances or eccentricities of manner. She understood the purpose of the examination. She did not appear to exaggerate or minimize her difficulties. Her motivation was

8

adequate.  Her remote recall skills were adequate but her short term memory skills were limited.

Her attention and concentration skills were marginally adequate.  She appeared to be of average

intelligence.  (R. at 451-52.)

Dr. McKinney assessed Plaintiff with PTSD, chronic; depressive disorder, not otherwise

specified; and alcohol and polysubstance dependence, both in sustained full remission.  She

assigned Plaintiff a GAF score of 57, also in the moderate symptomatology category.  (R. at 453.)

Dr. McKinney opined that Plaintiff did not have significant difficulties learning job-related

procedures in the past, and would likely not have significant difficulties understanding and

performing simple instructions but she might lose focus easily, resulting in difficulty following

multi-step instructions.  (*Id.*)  Dr. McKinney found that Plaintiff's attention and concentration

skills were "marginally adequate" and that she could lose focus over time, which would slow her

performance completing simple, repetitive tasks.  (*Id.*)  Dr. McKinney found that Plaintiff

followed the conversation during her evaluation, was not easily distracted, and showed adequate

task persistence during her examination.  (*Id.*)  Dr. McKinney concluded that stress and pressure

may lead to increased anxiety and decreased attention and concentration skills as well as

exacerbated symptomology.  Plaintiff's preoccupation with her physical health and emotional

difficulty may make it difficult for her to effectively cope with stress and pressure in a

competitive work environment.  (R. at 454.)

    **4.**      **State Agency Evaluation**

On May 13, 2011, after review of Plaintiff's medical record, Carl Tishler, Ph.D., a state agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace; with no episodes of decompensation of an extended duration. He further determined that the evidence did not establish the presence of the "C" criteria. (R. at 88.) Dr. Tishler found Plaintiff's allegations were only partially credible. (R. at 89.) Dr. Tishler assigned "great weight" to Dr. McKinney's assessment. (*Id.*) Dr. Tishler concluded that Plaintiff is capable of simple to moderately complex tasks with limited social interaction. (R. at 92.)

On October 5, 2011, state agency psychologist, Karla Voyten, Ph.D. reviewed the file on reconsideration and affirmed Dr. Tishler's assessment. (R. at 116-21.)

**B.   Physical Impairments**

**1.      Boris Terebuh, M.D.**

The record shows that Plaintiff treated with physical medical and rehabiliation specialist, Dr. Terebuh from April 2010 until at least November 2012. (R. at 435-46, 498-513, 643-55.)

On April 14, 2010, Dr. Terebuh noted he previously treated Plaintiff a year and a half prior for a workers' compensation claim. Plaintiff reported ongoing and worsening lumbosacral pain that bothered her while sitting and standing and rated her pain at 9/10 which she described as an aching and burning sensation. She also had aching and throbbing pain traveling down both legs into the posterior calves bilaterally with the right side more symptomatic than the left. On examination, Dr. Terebuh found tenderness with palpation in the lower lumbar paraspinals bilaterally. He found no corresponding inspection or palpation of skin abnormalities. Trunk

10

range of motion was limited and painful in all directions and she made numerous pain gestures with her hands and sighs. Gait was markedly antalgic on the left side. Dr. Terebuh recommend a right L5-Sl transforaminal epidural injection and Neurontin to address her radiculopathic symptoms. (R. at 445-46.)

Plaintiff received injections in April, May, and June 2010 (R. at 578-81) and another series in September and October 2010. (R. at 576-77.)

An MRI of the lumbar spine taken on January 5, 2011, showed mild narrowing at L3-4 and L4-5 due to degenerative changes in the adjacent facet joints, but no disc displacements. (R. at 583.)

On January 12, 2011, Dr. Terebuh noted that Plaintiff appeared fatigued. Examination found no misalignment through the lumbosacral spine. She was tender diffusely through the lumbar paraspinals with palpation and into the left posterior superior iliac spine area dramatically. Slight decreased left range of motion in all three planes with no significant deficits. Manual muscle testing was 5/5 in the lower extremity. Seated straight leg raise maneuver did irritate musculature but no neuropathic findings. Fabere maneuver was concordantly positive on the left and negative on the right. (R. at 435.)

In February 2011, Dr. Terebuh noted that Plaintiff's pain was disproportionate to his examination findings. (R. at 509.)

Plaintiff received further injections in April and May 2011. (R. at 574-75.)

On July 14, 2011, Plaintiff reported she was "doing better." On examination, she transitioned from sit to stand independently. Gait cycle was smooth and symmetric. Manual

muscle testing was 5/5 in the lower extremity and negative straight leg raise. Plaintiff was continued on her TENS Unit and pain medication. (R. at 502.)

Plaintiff was seen in September 2011, for pain exacerbation secondary to a fall and a motor vehicle accident. Lumbar x-ray revealed no acute abnormalities. Plaintiff had difficulty transitioning from sit to stand secondary to back pain. There was lumbar extension and rotation secondary to lumbar area discomfort. Manual muscle testing was 5/5 in the lower extremity. Sensation intact in the lower extremities. Her gait cycle was stiff for torso motion, but symmetric for lower extremity motion. Dr. Terebuh found no neuro deficits. He recommended a epidural steroid injection for pain. (R. at 498-501.)

Plaintiff received further injections in October 2011 and November 2012. (R. at 654-55.)

### 2.    Deborah Wilson, M.D.

Plaintiff treated with primary care physician, Dr. Wilson beginning in June 2005 to re-establish care. (R. at 373-74.)

When seen on January 22, 2009, Plaintiff reported constant pain in her bilateral hands noting she could barely hold an ink pen in her right hand. She indicated that her hands have swollen for about a week, right hand worse than left. Plaintiff also complained of ankle and foot tingling and numbness. Given these complaints and finding swelling on examination, Dr. Wilson ordered an EMG/NCV. (R. at 395-96.) Plaintiff underwent the EMG studies on January 30, 2009, which were normal lower and upper extremity. (R. at 361-63.)

On February 2, 2011, Plaintiff reported having episodes where she was unsure if they were seizures or a stroke. Dr. Wilson reported her neurological examination finding as normal cortical functions, cranial nerves, 5/5 motor strength bilaterally, no cerebellar signs, no tremors,

and a normal gait. An EEG was ordered due to Plaintiff's reported episodes of tingling, shaking and confusion. The provisional diagnosis was trans alter awareness, trance, tremor, emotional stress reaction. (R. at 406-07.) The EEG performed on February 9, 2011 was normal. (R. at 411.)

### 3.    Mary Rutan Hospital

Plaintiff presented to the emergency room on January 23, 2011 with having stroke like symptoms. (R. at 594-605.) A CT of the head was within normal limits. (R. at 412, 605.) Plaintiff was discharged in stable condition. (R. at 598.)

### 4.    State Agency Evaluation

On May 11, 2011, state agency physician, Elizabeth Das, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. Dr. Das opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in a workday; and sit for about six hours in a workday. (R. at 90.) Dr. Das found that Plaintiff was also limited to frequently climb ramps/stairs, stoop, kneel, crawl, or crouch; and only occasionally climb ladders/ropes/scaffolds. (*Id.*) Dr. Das concluded that Plaintiff is only partially credible. (R. at 89.) William Bolz, M.D. reviewed Plaintiff's records upon reconsideration on October 7, 2011, and essentially affirmed Dr. Das' assessment. (R. at 118-19.)

## IV.    ADMINISTRATIVE DECISION

On February 1, 2013, the ALJ issued her decision. (R. at 13–29.) The ALJ found that Plaintiff met the special earnings requirements of the Act through December 31, 2013. (R. at

18.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not

engaged in substantially gainful activity since his alleged onset date of December 31, 2008.  (*Id.*)

The ALJ found that Plaintiff had the severe impairments of mild lumbar degenerative disc

disease and mood disorder.  (*Id.*)  She further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 20.)  At step four of the

sequential process, the ALJ determined that Plaintiff has the residual functional capacity ("RFC")

to perform unskilled, medium work that is low stress and defined as no assembly line production

quotas and not fast paced.  (R. at 21.)  The ALJ found Plaintiff's impairments could reasonably

be expected to cause the alleged symptoms.  The ALJ, however, found that her statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible.  (R. at 22.)  The ALJ found the diagnoses by Dr. Terebuh were not supported by the

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

medical evidence of record including his own clinical findings. (R. at 22.) The ALJ assigned little weight to Dr. Das' and Dr. Bolz's opinions that Plaintiff is restricted to light exertion. (R. at 23.) The ALJ noted that Dr. McKinney's concerns regarding Plaintiff's psychological limitations were addressed in the RFC by restricting Plaintiff to unskilled work and work that is low stress. (R. at 24.) The ALJ gave some weight to the opinions of Dr. Tishler and Dr. Voyten that Plaintiff was capable of simple to moderately complex tasks with limited social interaction, but found that their opinions as to Plaintiff's social limitation were not supported by the record. (*Id.*) The ALJ determined that the conclusion of treating psychiatrist Dr. Cowan that Plaintiff is rendered "unemployable" could not be given controlling, or even deferential, weight because that conclusion is neither well supported by medically acceptable clinical findings nor consistent with other substantial evidence in the case record. (R. at 25.) Relying on the VE's testimony, the ALJ concluded that Plaintiff could perform her past relevant work. (R. at 28-29.) She therefore concluded that Plaintiff was not disabled under the Social Security Act from February 9, 2010 through the date of the decision. (R. at 29.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

15

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ erred in determining Plaintiff's mental RFC ("MRFC"). Specifically, Plaintiff contends that the ALJ failed to properly weigh and evaluate the medical opinion of treating psychiatrist, Dr. Cowan and consultative psychologist, Dr. McKinney. Within this contention of error, Plaintiff suggests that the ALJ erred in determining her MRFC by "playing doctor." Plaintiff also contends that the ALJ's determination regarding Plaintiff's physical RFC was contrary to substantial evidence because she rejected the only two medical opinions in the record, assigning little weight to opinions of the

16

state agency reviewing physicians. Plaintiff again asserts that the ALJ played doctor as to this finding regarding her physical RFC. Finally, Plaintiff argues that the ALJ erred at Step 4 of the sequential evaluation by relying on the response from the VE to a hypothetical question that did not account for all of Plaintiff's limitations. (ECF Nos. 10 and 18.) The Court addresses each of Plaintiff's contentions of error below, turning first to Plaintiff's arguments regarding her physical RFC.

## A.    The ALJ's Physical RFC Determination is Supported by Substantial Evidence

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he or she set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory

17

findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Here, in determining Plaintiff's physical RFC, the ALJ concluded that the opinions of the reviewing physicians that the Plaintiff is restricted to light exertion were entitled to little weight. The ALJ concluded that their opinions were not supported by the medical evidence. (R. at 23.) Plaintiff contends that this determination is not supported by substantial evidence because the ALJ purportedly was playing doctor and because it was contrary to other substantial evidence in the record. The Court disagrees.

The ALJ reasonably determined that the objective medical evidence in the record was inconsistent with the reviewing physicians' opinions and adequately explained her rationale. *See* 20 C.F.R. § 404.1527(d)(3)-(4) (medical opinions are evaluated for supportability and consistency). Substantial evidence supports this conclusion. The objective evidence revealed only minimal physical findings. By way of example, a January 2011 MRI of Plaintiff's lumbar spine showed mild narrowing at L3-4 and L4-5 due to degenerative changes in the adjacent facet joints, but no disc displacements. (R. at 561.) Plaintiff also had normal lower and upper extremity EMG studies. (R. at 362-63.) In February 2011, Plaintiff's treating physician, Boris Terebuh, M.D., noted that Plaintiff's pain was disproportionate to his clinical findings. (R. at 509.) Dr. Terebuh's treatment notes reveal that Plaintiff had no dislocation or subluxation in her legs, her strength was 5/5, she had intact sensation to light touch, and her gait was smooth and

18

symmetric. (R. at 435, 438-39). Plaintiff's straight leg test was negative as were several other objective tests. (R. at 435, 438, 478). Plaintiff's course of treatment was conservative and involved injections and physical therapy, but no discussion of surgical relief. (R. at 435, 438-46, 499-510). Indeed, Dr. Terebuh noted that Plaintiff did not need a cane for balance and denied her multiple requests for a disability placard for her car to encourage her to walk more. (R. at 482, 649, 675, 679.) Morever, as the ALJ noted, many of Plaintiff's complaints regarding pain and stiffness were the result of falls or other accidents, not because of her chronic physical impairments. (R. at 23, 435, 563.) Contrary to Plaintiff's assertion, the ALJ was not "playing doctor," but instead was resolving conflicts in the record. All of this objective evidence is adequate to support the ALJ's decision to discount the reviewing physician's opinions regarding Plaintiff's ability to perform light work in favor of her determination that the evidence indicated that Plaintiff could perform medium work.

Plaintiff nonetheless contends that the ALJ should have found her able to complete only light, not medium work. To support this assertion, Plaintiff again points to the opinions of the state agency reviewing physicians, Elizabeth Das, M.D., and William Bolz, M.D. Yet, the ALJ questioned the VE about jobs that a hypothetical person with Plaintiff's vocational background could perform if she were limited to light work. (R. at 77-78.) In response, the VE testified that the individual could do the jobs of mail clerk sorter, night cleaner, and photocopy machine operator, which are available in significant numbers in the national and regional economy.[3] (Id.

---

[3]The VE testified that approximately 37,000 of these jobs would be available accumulatively in the region. (R. at 83.) This constitutes a significant number of jobs. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (refusing to set forth a specific number as a boundary between significant and insignificant number of jobs and counseling courts to make case-by-case determination); *Nejat v. Comm'r of Soc. Security*, 359 F. App'x 574, 579 (6th Cir.

at 78.) Therefore, even if the ALJ had adopted the opinions of the state reviewing physicians and limited Plaintiff to light work as Plaintiff contends, she still would not be disabled.  As a result, any error on the part of the ALJ was harmless.  Put another way, even if the ALJ had limited Plaintiff to light work, the Commissioner still would have met her burden of showing that a significant number of jobs are available to Plaintiff.  Plaintiff's Statement of Errors in this regard is accordingly overruled.

**B.**    **The ALJ's Mental RFC Determination is Supported by Substantial Evidence**

Plaintiff maintains that the ALJ committed error in evaluating the limitations caused by her mental impairments.  Specifically, she maintains that the ALJ erred in evaluating the opinion of the consultative examiner, Regina McKinney, Psy.D., with regard to Plaintiff's purported impairments in social functioning.  Plaintiff also faults the ALJ for giving only little weight to her treating psychiatrist, Allison Cowan, M.D.  The Court finds Plaintiff's arguments are without merit.

1.    <u>Dr. Cowan</u>

Plaintiff contends that the ALJ's finding as to her MRFC was not supported by substantial evidence because she erred in weighing and evaluating Plaintiff's treating physician's opinion.  The Court again disagrees.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms,

_____

2009) (finding 2,000 jobs significant).

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

Id. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550

21

(6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore "might be especially bewildered
> when told by an administrative bureaucracy that she is not, unless some reason for
> the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).
> The requirement also ensures that the ALJ applies the treating physician rule and
> permits meaningful review of the ALJ's application of the rule. *See Halloran v.
> Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.

Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

The ALJ here found that Dr. Cowan's opinion was not entitled to controlling weight

because it was not fully supported by and was inconsistent with the greater weight of the medical

evidence. The ALJ therefore found that it was entitled to little weight. (R. at 24-25.) Contrary

22

to Plaintiff's assertions, the ALJ provided several good reasons for rejecting Dr. Cowan's

opinion as controlling and substantial evidence supports these conclusions.

The ALJ properly discounted the conclusory statement in Dr. Cowan's opinion in which

she opined that Plaintiff would not be likely "to be able to do full-time employment 8 hours a day

5 days a week." (R. at 24.) As set forth above, this type of conclusory opinion is not entitled to

any special deference. *See* 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the

determination or decision about whether you meet the statutory definition of disability. . . . A

statement by a medical source that you are "disabled" or "unable to work" does not mean that we

will determine that you are disabled); *see also* SSR 96-5p (treating source opinions on issues

reserved to the Commissioner, such as the ultimate finding of disability, are never entitled to

controlling weight or special significance).

As for the remainder of Dr. Cowan's opinion, the ALJ found it internally inconsistent and

inconsistent with the evidence in the record. This determination, too, is supported by substantial

evidence. The ALJ noted that Dr. Cowan opined that Plaintiff would have only mild impairment

in her ability to respond to workplace changes and in her ability to perform and complete work

tasks in a normal workday at a consistent pace. The ALJ contrasted this opinion with Dr.

Cowan's conclusion that she also had marked impairments in her ability to behave predictably,

reliably and in an emotionally stable manner. (Id.) The ALJ properly determined that these

statements were somewhat incongruous. (Id.) The ALJ also noted that the extreme parts of Dr.

Cowan's opinion were not consistent with the evidence in the record, including her own

treatment notes. Dr. Cowan put great importance on Plaintiff's pseudo seizures. The record,

however, contains no medical or clinical findings confirming these pseudo seizures. Dr.

23

Cowan's opinion accordingly was based exclusively on Plaintiff's subjective reports. (Id.)

Indeed, both Plaintiff's EEG and brain MRI revealed normal results. (R. at 411, 477.) Further,

neurological examinations revealed that Plaintiff had normal cortical functions, cranial nerves,

full motor strength bilaterally, no cerebellar signs, no tremors, and a normal gait. (R. at 406.)

Substantial evidence supports the ALJ determination that Dr. Cowan's opinion, as it related to

Plaintiff's pseudo seizures, was unsupported by the objective evidence. *See Helm v. Comm'r of*

*Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011) (concluding that the ALJ met the "good

reasons" requirement for a variety of reasons, including by noting that the treating physician's

findings were "unsupported by objective medical findings and inconsistent with the record as a

whole"); *see also* 20 C.F.R. § 404.1527(d)(3) (identifying "supportability" and "consistency"

with the record as a whole as relevant considerations); *Ferguson v. Comm'r of Soc. Sec.*, 628

F.3d 269, 273-74 (6th Cir. 2010) (concluding that the ALJ did not err in rejecting a medical

opinion based on the claimant's subjective complaints, which were not supported by objective

medical evidence).

The ALJ determination that Dr. Cowan's extreme opinion regarding Plaintiff's

limitations was inconsistent with treatment notes and the record is also supported by substantial

evidence. Dr. Cowan's notes reveal that Plaintiff had a Global Assessment of Functioning

(GAF) score of 57 and 60, indicating moderate, and almost mild, symptoms. (R. at 453, 641.)

The ALJ therefore properly discounted Dr. Cowan's opinion. *See Jones v. Comm'r of Soc. Sec.*,

336 F.3d 469, 477 (6th Cir. 2003) ("If the treating physician's opinion is not supported by

objective medical evidence, the ALJ is entitled to discredit the opinion as long as [she] sets forth

a reasoned basis for [her] rejection.").

Moreover, Plaintiff's activities of daily living, including the fact that she took care of three children, lived with a longterm boyfriend, got along well with medical providers, home schooled her son, attended school events, and managed her child's health care needs, also are inconsistent with Dr. Cowan's restrictive opinion. The ALJ's determination in this regard also is proper. *See* 20 C.F.R. § 404.1527(d)(3)-(4) (medical opinions evaluated for consistency and supportability); *see also Kidd v. Comm'r of Soc. Sec.,* 283 F. App'x 336, 342 (6th Cir. 2008) (ALJ may consider household and social activities in which claimant engages in evaluating her assertions of pain or limitations).

Finally, the ALJ's decision to discount Dr. Cowan's opinion because it was inconsistent with the opinions of the state agency reviewing psychologists is likewise supported by substantial evidence. The reviewing psychologists opined that Plaintiff could perform moderately complex tasks. The ALJ nevertheless gave a less restrictive limitation in that she limited Plaintiff to unskilled work that was low stress with no assembly line production quotas and no fast pace. The ALJ reasonably relied on the state agency reviewing psychologists' opinions in forming her RFC and in giving Dr. Cowan's opinion only little weight. *See* 20 C.F.R. § 404.1527(d)(3)-(4); 20 C.F.R. § 404.1527(e)(2)(i) (state agency consultants are "highly qualified physicians and psychologist who are also experts in Social Security disability evaluation."); *Blakely v. Comm'r of Soc. Sec.,* 581 F. 3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency physicians over [Plaintiff]'s treating sources was not, by itself, reversible error.").

Because the ALJ's findings are supported by substantial evidence, this Court defers to those findings "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal citations omitted).

    2.    Dr. McKinney

As to the ALJ's assessment of Dr. McKinney's opinion, Plaintiff contends that the ALJ failed to account for impairments in social functioning and gave "absolutely no limitations in contact with others." (Pl. Brief, at 12 (ECF No. 10).) She claims that Dr. McKinney "specifically mentioned problems with larger groups of people," "raised concerns regarding interpersonal contact abilities," and "expressed doubt" that Plaintiff "could sustain work in any competitive work environment." (Id.) A close review of Dr. McKinney's opinion reveals, however, that she was merely mentioning Plaintiff's self reports on these matters or that Plaintiff has misinterpreted Dr. McKinney's opinions.

Dr. McKinney examined Plaintiff in April 2011 on behalf of the state. She diagnosed Plaintiff with posttraumatic stress disorder and depressive disorder and assigned her a GAF score of 57, indicating moderate symptomatology. (R. at 453.) Dr. McKinney opined that Plaintiff did not have significant difficulties learning job-related procedures in the past, and would likely not have significant difficulties understanding and performing simple instructions. (Id.) Dr. McKinney noted that, due to her impairments, Plaintiff might lose focus easily, resulting in difficulty following multi-step instructions. Dr. McKinney also opined that Plaintiff's attention and concentration skills were only "marginally adequate" and that she could lose focus over time, which would slow her performance completing simple, repetitive tasks. (Id.) With regard to Plaintiff's abilities to respond appropriately to supervision and coworkers, Dr. McKinney

26

indicated that Plaintiff "alluded to" anger control difficulties," and "reported" feeling uncomfortable in crowds. (R. at 454.) With regard to responding to work pressures, Dr. McKinney found that Plaintiff's "preoccupation with her physical health and emotional difficulties *may make it difficult for her to effectively cope with stress and pressure in a competitive work environment.*" (Id.) Contrary to Plaintiff's assertion that Dr. McKinney opined about significant impairments in social functioning, the ALJ fully examined and evaluated this opinion, including Dr. McKinney's observation that Plaintiff had only marginally adequate attention and concentration, and accommodated Dr. McKinney's recommendations by specifically restricting Plaintiff to unskilled work and work that was low stress.[4]

Moreover, even if Dr. McKinney had expressly opined that Plaintiff was capable of only limited social interaction, any failure of the ALJ to include any limitations in how much social interaction Plaintiff could tolerate at a job in her RFC would be harmless error. The ALJ limited Plaintiff to only occasional interaction with her coworkers, supervisors, and the general public in her hypothetical question to the VE. (R. at 77.) Thus, even if the ALJ should have included social restrictions in her RFC assessment, any error was harmless because it would not change the number of jobs that Plaintiff could perform in the national economy.

The Court therefore overrules this assignment of error.

---

[4]Notably, in assessing whether Plaintiff's mental impairments satisfied the "paragraph B" criteria, the ALJ gave "little weight" to the opinions of Drs. Voyten and Tishler who found that Plaintiff may be distracted when working in close proximity to others. The ALJ concluded that this opinion is "unsupported by this record which demonstrates normal and significant social activity. . . ." (R. at 21.)

27

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial

evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of

Errors is **OVERRULED** and Commissioner's decision is **AFFIRMED**. The Clerk is

**DIRECTED** to enter judgment in favor of Defendant and to terminate this case.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE